Ireneo G. AMES, Plaintiff,

v.

CARTIER, INC., Defendant.

No. 00 Civ. 3427(CBM).

United States District Court, S.D. New York.

March 29, 2002.

Michael J. D'Angelo, Ralph A. Somma, Somma, Zabell & Associates, LLP, for Plaintiff.

Lori Bauer, Jackson Lewis Schnitzler & Krupman, New York, NY, for Defendant.

### *MEMORANDUM OPINION & ORDER*

MOTLEY, District Judge.

## I. INTRODUCTION

Plaintiff Ireneo G. Ames brings this action against his former employer, defendant Cartier, Inc., alleging unlawful employment discrimination on the bases of sex and national origin.[1] Plaintiff asserts

---

1. Plaintiff's Complaint alleges that defendant discriminated against him on the bases of "sex" and "ethnicity," *see* Compl. ¶¶ 17, 19, 21, whereas the arguments in the parties' briefs consistently refer to the allegations as

claims under Title VII (42 U.S.C. § 2000e, *et seq.*), as well as 42 U.S.C. § 1981, the New York State Human Rights Law (N.Y. Exec. Law § 296), and the New York City Human Rights Law (New York City Admin. Code § 8–107(1)). Discovery has been completed. Now before the court is defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, defendant's motion must be denied.

## II. FACTUAL BACKGROUND

On a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149 (2d Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Therefore, unless otherwise indicated, the following recital of the facts represents plaintiff's version of events.

Plaintiff Ireneo Ames is a male of Filipino descent. Defendant Cartier, Inc. ("Cartier") is a purveyor of fine jewelry and other luxury items. In October 1998 Mr. Ames commenced employment with Cartier's Fifth Avenue store. He was hired as a temporary holiday sales associate and was assigned to the gift and stationery department. His immediate supervisor was Ms. Lorraine Littles. Ms. Littles reported to Cynthia Fiske. Ms. Fiske reported to Mary Grieve–Smith who was the manager of the Fifth Avenue store.

In February 1999 Mr. Ames became a regular full-time employee in the gift and stationery department. In May 1999 Mr. Ames had his ninety-day performance evaluation with Ms. Fiske. Cartier's performance evaluation form had several performance categories (attendance/punctuality, appearance, cooperation, dependability, initiative, production, potential stability, and overall) with check-boxes corresponding to a ratings scale (outstanding, good, satisfactory, marginal, and unsatisfactory). Mr. Ames received "satisfactory" or higher performance ratings for attendance, appearance, cooperation, initiative, production, stability, and overall. For attitude and dependability, Mr. Ames received "satisfactory/marginal" or "marginal" ratings (it is unclear from the form which box was checked). He received no "unsatisfactory" ratings. At the bottom of the evaluation, it indicated that he had successfully completed his introductory period. In the "additional comments" section, Ms. Fiske wrote, "René has made an attempt to adapt to his environment despite interpersonal difficulties that existed in the department. The main area of improvement is security compliance regarding locking of merchandise. René left earrings in a desk drawer which is a security violation."

In May 1999 Cartier announced that it would be opening a new Madison Avenue boutique in July 1999. Mr. Ames informed Ms. Grieve–Smith that he wished to transfer to the new boutique. Hamida Belkadi, a Cartier employee since 1987, was selected to be the new boutique's manager. As the new manager, Ms. Belkadi had to hire four sales associates and one bookkeeper. In June 1999 Ms. Belkadi hired Karen Adams, Cassandra Gut, and – with Ms. Grieve–Smith's authorization – Mr. Ames as sales associates at the new boutique. She also hired Celia Patubo, a Filipina–American, as bookkeeper. Ms.

claims of "gender" and "national origin" discrimination. The court notes that the language of Title VII only prohibits discrimination on the bases of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–

2(a)(1). Thus, for purposes of this motion, the court will assume that the allegations are of discrimination on the bases of "sex" and "national origin."

Adams had eight years of jewelry sales experience when hired. Mr. Ames's salary was increased to that of Ms. Gut's effective with his transfer to the new boutique. On July 2, 1999, Mr. Ames started at the boutique as a sales associate. Sometime in July Ms. Belkadi also hired Ms. Lee Caissie as a sales associate.

Shortly after the store opened, Mr. Ames asked for personal leave. Ms. Belkadi denied his request. Ms. Gut was permitted to take one personal day in July 1999; that day had been requested prior to her acceptance of her position at the new boutique. Mr. Ames had asked for one personal day to be taken during August. Ms. Belkadi initially denied his request, stating that as a transferee, he was not eligible to take vacation time – contradicting what the human resources department had told Mr. Ames prior to his transfer. Eventually, however, Ms. Belkadi granted Mr. Ames's request. Although Ms. Belkadi approved the request for leave, Mr. Ames's employment was terminated prior to the scheduled date.

At the new Madison Avenue boutique, Cartier displays high value items in the display windows. Ms. Belkadi preferred that the employees not handle the display window jewelry so as to avoid misplacement of the items. Ms. Belkadi assumed responsibility for arranging items in the display windows. She claims that when an employee demonstrates his or her ability to display the merchandise properly, only then does she issue the employee a set of keys to the window display. Eventually Ms. Gut, Ms. Adams, and Ms. Caissie were all given keys to the window display, while Mr. Ames never was. As for keys to the display cabinets, Ms. Belkadi did distribute a set to all of the sales associates.

The Madison Avenue boutique maintains a single marble restroom which is used by employees and customers alike. Since customers use the restroom, Ms. Belkadi requested that it be kept in a neat and presentable condition. Ms. Belkadi claims that she told the whole staff, without reference to any particular employee, to wipe up any excess water around the sink and to always put the toilet seat down. Mr. Ames contends that Ms. Belkadi specifically singled him out – blaming, humiliating, and publicly admonishing him for the unclean state of the bathroom in front of the entire sales staff.

In July 1999 a "Russian couple" entered the boutique, and Mr. Ames approached them, offering his assistance. Although the party had not yet made a decision as to what, if anything, they were going to purchase, they requested to see an item in the display window. Mr. Ames excused himself and went to the back of the store to retrieve Ms. Belkadi's display window keys. During Mr. Ames's absence. Ms. Caissie showed the party additional items. Upon his return to the sales floor, Mr. Ames saw Ms. Caissie assisting the party and became upset.

Mr. Ames approached Ms. Belkadi and informed her that Ms. Caissie had improperly assumed his sale. In response, Ms. Belkadi told Mr. Ames not to interfere with the sale. She told him, "Oh, he's Russian and Russian men like to flirt with pretty blonds [sic]." At a staff meeting shortly thereafter, Mr. Ames brought up the incident. Ms. Belkadi stated that "from [her] long selling experience [she feels] that some people [can] sell more effectively than others because [they] share ... certain elements of their lives with [the customer]." In addition, when Ms. Caissie stated that "most people would relate to people who look like themselves and have some things in common," Ms. Belkadi concurred. The Russian couple did not buy anything. Two days after the encounter, Ms. Belkadi told Mr. Ames that he would

have received a commission if a sale had occurred.

Shortly thereafter, a rotation system was implemented wherein each sales associate would take a turn waiting on customers. Ms. Belkadi claims that she implemented the system because of Mr. Ames's overly aggressive sales tactics – he was allegedly trying to steal all the customers from his coworkers. In response, Mr. Ames says that the system was implemented by the associates themselves. Ms. Gut testified in her deposition that Mr. Ames was a team player and fair when it came to helping clients.

On August 7, 1999, Ms. Belkadi terminated Mr. Ames, approximately five weeks after he had started at the boutique. Ms. Belkadi filled out a performance evaluation form for Mr. Ames on August 6, 1999. The form itself was identical to the type completed by Ms. Fiske in May 1999. In stark contrast to the May evaluation, however, Mr. Ames now had earned "unsatisfactory" ratings in attitude, cooperation, dependability, initiative, production, potential, and overall. In the "additional comments" section, the evaluation lists five specific reasons for Mr. Ames's termination: (1) his "poor penmanship"; (2) his "constant challenge of [Ms. Belkadi's] directions, citing [the Fifth Avenue store's practices] as the criteria for [his] actions"; (3) his "inability to display a showcase case properly and within a reasonable time"; (4) his "mistakenly selling a ring for far less than its actual retail price"; and (5) his contacting the Fifth Avenue store for a discount authorization when Ms. Belkadi was out of town. Cartier continues to rely on these reasons as justifications for Mr. Ames's termination.

Mr. Ames responds that these purported reasons are merely pretext for discrimination. As for the poor handwriting, Mr. Ames points out that no manager at the Fifth Avenue store had a problem with his handwriting, nor did Ms. Adams, the assistant manager at the Madison Avenue boutique. As for challenging Ms. Belkadi's directions, Mr. Ames claims that Ms. Belkadi invited suggestions from the staff and that he merely responded to her invitations by volunteering his experiences at the Fifth Avenue store. As for the inability to arrange a display case in a reasonable period of time, Mr. Ames concedes that it took him up to thirty minutes to arrange the case, rather than the ten minutes demanded by Ms. Belkadi. However, Mr. Ames states that he took longer because he was merely following the instructions given in his on-the-job training and in the written materials he received; the other employees did not follow those directions and therefore could complete the job faster. As for selling the ring at the wrong price, Mr. Ames states that someone else (the bookkeeper, presumably) had mislabeled the ring. Finally, as for calling the Fifth Avenue store manager for a discount authorization, Mr. Ames states that he was not given Ms. Belkadi's cell phone number and therefore could not call her when she was out of town.

## III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if "there is no genuine issue as to material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The burden is on the movant to demonstrate that no genuine issue respecting any material fact exists. *See Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir. 1994). "In assessing the record to determine if such issues exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133–34 (2d Cir.2000) (citing *Anderson,* 477 U.S. at

255, 106 S.Ct. 2505). On a motion for summary judgment, it is not for the district court to actually *try* the issues; rather, its function is to determine whether there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party as to any material fact. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

When reviewing the record in a Title VII case, "the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole." *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir.2000). Moreover, "an extra measure of caution is merited" when passing on a summary judgment motion in a discrimination action "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.2001); *see Gallo*, 22 F.3d at 1224 ("A trial court must be cautious about granting summary judgment to an employer where, as here, its intent is at issue.").

## IV. DISCUSSION

### A. The Title VII and Pendent State and Local Law Claims

■ As an initial matter, the court notes that analysis of claims of discrimination under the New York State Human Rights Law and the New York City Human Rights Law proceeds under the same analytical framework as Title VII claims. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999). Therefore the following discussion of plaintiff's Title VII

claims applies equally to his state and local law claims.

Courts have analyzed claims under Title VII in at least two ways. If a plaintiff can produce direct evidence of discrimination, then a "mixed-motive" analysis is appropriate. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Fisher v. Vassar College*, 70 F.3d 1420, 1432 (2d Cir.1995); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.1992). If a plaintiff proffers only indirect or circumstantial evidence of discrimination, then a "pretext" analysis applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Fisher*, 70 F.3d at 1433; *Tyler*, 958 F.2d at 1180–81. Plaintiff argues both theories in his attempt to defeat the defendant's motion for summary judgment.

### 1. Mixed–Motive Theory

■ In a mixed-motive Title VII case, a plaintiff must demonstrate that "a prohibited discriminatory factor played a motivating part in a challenged employment decision." *Raskin v. Wyatt*, 125 F.3d 55, 60 (2d Cir.1997). Once the plaintiff has established that fact, the burden then "shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway." *Id.* In order to survive a motion for summary judgment, a plaintiff must adduce sufficient direct evidence of discrimination that, if believed, would permit a reasonable jury to conclude that a discriminatory factor did, in fact, play a motivating role in the plaintiff's termination. *See Tyler*, 958 F.2d at 1179–80; *Cartagena v. Ogden Servs. Corp.*, 995 F.Supp. 459, 462–64 (S.D.N.Y.1998); *see also Raskin*, 125 F.3d at 60 ("[P]laintiff must show that the evidence is sufficient to allow a factfinder to

infer both permissible and discriminatory motives.").

If a plaintiff chooses to pursue a mixed-motive theory in a discrimination case, "he must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Tyler*, 958 F.2d at 1181. The evidence adduced by the plaintiff must be "directly tied to the forbidden animus, for example *policy documents or statements of a person involved in the decisionmaking process* that reflect a discriminatory or retaliatory animus of the type complained of in the suit." *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 122 (2d Cir. 1997) (original emphasis). As (then-District) Judge Sotomayor has explained, in this context the term "direct evidence" is "something of a misnomer, in that any evidence short of a bald statement by the decisionmaker to the effect that they are firing an employee for an impermissible reason requires *some* inferential step to support a finding of discriminatory motive". *Cartagena*, 995 F.Supp. at 462, (original emphasis). In a mixed-motive case, the term "direct evidence" is used "to distinguish direct evidence from the kind of evidence which makes out a *McDonnell Douglas* prima facie case – i.e., evidence from which an inference of discrimination arises only because 'it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection,' and which inference is therefore immediately dispelled once the employer has produced evidence of a non-discriminatory reason." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *cf. Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000) (observing that *McDonnell Douglas* analysis is appropriate when there is lack of "direct or *overt* evidence of discriminatory conduct" (emphasis added)).

Plaintiff argues three points as direct evidence in support of his mixed-motive theory of the case. First, he argues that Ms. Belkadi's comments and actions during and after the visit of the Russian customer constitute direct evidence of a discriminatory sales policy – and, by extension, a discriminatory employment policy. Second, he argues that the fact he was not given a key to the display windows is direct evidence of discrimination. Finally, he argues that the manner in which Ms. Belkadi treated him with respect to the cleanliness of the bathroom is direct evidence of discrimination.

Defendant, unsurprisingly, argues that none of these three points constitutes direct evidence of discrimination. First, defendant argues that since Ms. Belkadi's comments did not relate to the decisional process at issue, i.e., plaintiff's termination, the comments are not direct evidence of discrimination. The court disagrees. As explained above, direct evidence does not necessarily mean the proverbial smoking gun, i.e., an unequivocal statement by an employer that an employee is being terminated for an impermissible reason. *See Cartagena*, 995 F.Supp. at 462. Rather, direct evidence is evidence "directly *reflecting* the alleged discriminatory attitude." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997) (emphasis added) (quoting *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992)). Assuming the truth of plaintiff's testimony (as, for purposes of this motion, the court must), Ms. Belkadi's repeated statements undeniably reflect a discriminatory attitude on the part of the decisionmaker. As in *Cartagena*, the court cannot contemplate any legitimate, nondiscriminatory reason which could dispel the inference raised by plaintiff's proffered evidence. The gist of plaintiff's allegations is that defendant's white male customers were to

be served by white female sales associates. While pandering to customers' discriminatory preferences could very well help effectuate a sale, employers nevertheless "may not discriminate on the basis of their customers' preferences." *Wigginess Inc. v. Fruchtman*, 482 F.Supp. 681, 692 (S.D.N.Y.1979), *aff'd*, 628 F.2d 1346 (1980) (citing *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)). Defendant has suggested no lawful reason for maintaining a discriminatory sales and employment policy. Evidence of such a policy constitutes sufficient direct evidence to support plaintiff's mixed-motive claim. *See Cartagena*, 995 F.Supp. at 462.

Defendant is correct that the plaintiff's other two points – Ms. Belkadi's failure to give plaintiff a key to the display cases and her public admonition of him concerning the restroom – do not constitute direct evidence of discrimination. There are any number of valid, nondiscriminatory reasons which could have justified Ms. Belkadi's actions in those two circumstances. For example, if, as defendant claims, plaintiff failed to demonstrate an ability to properly arrange the display cases, then perhaps plaintiff did not merit a key. And if plaintiff had, in fact, been responsible for the unacceptable state of the restroom, then perhaps Ms. Belkadi would have been justified in publicly admonishing him. Thus these latter two points provide at best circumstantial evidence of discrimination and on their own do not support a mixed-motive theory of the case.

However, since plaintiff has adduced direct evidence which, if believed by a jury, would permit the jury to conclude that defendant maintained a discriminatory sales and employment policy, summary judgment for the defendant as to the Title VII claims is inappropriate.

### 2. Pretext Theory

Even assuming that plaintiff's mixed-motive theory of the case fails, plaintiff is still entitled to proceed to trial under a pretext theory. "In pretext cases, we use the familiar burden-shifting framework first articulated in *McDonnell Douglas*." *Raskin*, 125 F.3d at 59 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). First, a plaintiff must establish a prima facie case by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000). Once a plaintiff has succeeded in presenting her prima facie case, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* "Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture." *Id.* The burden then shifts back to the plaintiff who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.* "Whether summary judgment is appropriate in a particular case depends upon 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Aguirre v. N.Y. State Police*, 156 F.Supp.2d 305, 307 (S.D.N.Y.2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

■ *a. Plaintiff's Prima Facie Case.* In the instant case, turning to the first

strand of the *McDonnell Douglas* analysis, it cannot be seriously doubted that plaintiff has satisfied the first and third elements of his prima facie case. Plaintiff is a Filipino male – national origin and sex are classes protected by Title VII – and defendant terminated plaintiff's employment. As to the second and fourth elements, however, defendant strenuously argues that plaintiff has failed to make out a prima facie case. Defendant asserts that plaintiff was not performing his job duties satisfactorily and that plaintiff was not terminated under circumstances giving rise to an inference of discrimination.

 Notwithstanding defendant's assertions, plaintiff has made out a prima facie case. First, as a general matter, "[t]he burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minimis." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (internal quotations and modifications omitted); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (describing requirements of prima facie case as "minimal"); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001) ("The burden upon the plaintiff to prove a prima facie case is minimal.").

Turning the disputed elements of plaintiff's prima facie case, "for the satisfactory performance prong .... [plaintiffs] 'need not demonstrate that [their] performance' is flawless or superior, but rather only that [they] 'possess the basic skills necessary for performance of the job.'" *Aguirre*, 156 F.Supp.2d at 318 (quoting *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir.1996)). Plaintiff has produced credible evidence that he did have the basic skills necessary to work as a salesperson. Barely three months prior to his termination,

plaintiff received an evaluation from Ms. Fiske that rated his overall performance as "satisfactory," and he scored even higher in several different individual skills area. Defendant makes much of the fact that at the time of plaintiff's termination, Ms. Belkadi's evaluation of plaintiff was negative. Plaintiff responds that Ms. Belkadi's negative evaluation merely evidences discriminatory animus and pretext. Since the burden on plaintiff at this stage is minimal, and since all positive inferences must be drawn in favor of plaintiff, the court finds that plaintiff has produced credible evidence that he possesses the basic skills necessary for the job, thereby satisfying the performance prong of the *McDonnell Douglas* prima facie case. *See de la Cruz*, 82 F.3d at 21 ("[A] performance evaluation that is positive overall is sufficient to withstand summary judgment at the prima facie stage of analysis.").

As for the fourth prong, "[i]n determining whether the plaintiff has met the de minimis initial burden of showing 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir.1995) (quoting *Chambers*, 43 F.3d at 38). As indicated above, plaintiff has adduced direct evidence which, if believed, would permit a fact-finder to conclude that defendant maintained a discriminatory sales and employment policy. *See supra* Part IV.A.1. That, combined with the circumstantial evidence plaintiff has marshaled (regarding vacation time, keys to the display cases, and the maintenance of the restroom), provide ample evidence to meet the minimal requirements of a prima facie case.

Defendant makes much of the fact that Ms. Belkadi both hired and fired plaintiff, that plaintiff was replaced by a male sales associate, and that Ms. Belkadi had worked with a Filipina employee for approximately thirteen years. While all of these facts could lead a jury to conclude that defendant did not discriminate against plaintiff, none of them *requires* such a conclusion. When the same person both hires and fires a plaintiff, the court may draw a "same-actor inference" – that an employer would not have hired the person to begin with if she harbored discriminatory animus towards members of plaintiff's protected class. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997). While such an inference may be appropriate in some cases, given plaintiff's allegations, the court is not convinced that such an inference should be drawn in this case. A factfinder could reasonably conclude that Ms. Belkadi hired plaintiff to only serve female customers or other persons of color and that Ms. Belkadi fired plaintiff when he objected to the discriminatory sales policy. As for plaintiff's replacement, the fact that Ms. Belkadi filled his position with another male could negate an inference of discrimination if plaintiff had not provided other direct evidence of discrimination. Given plaintiff's proffered evidence concerning defendant's discriminatory sales policy, it is perhaps unsurprising that defendant replaced plaintiff with another male (to wait on female customers). Finally, the fact that Ms. Pitubo is Filipina is largely irrelevant. Ms. Pitubo was not similarly situated to plaintiff; Ms. Pitubo's position is that of bookkeeper, a position with relatively little public contact and fundamentally different from that of a sales associate.

A unanimous Supreme Court has recently reiterated, "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Swier-*

*kiewicz v. Sorema N.A.,* 534 U.S. 506, ——, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002). "Rather, they were intended only to promote the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to 'raise[ ] an inference of discrimination.'" *Meiri v. Dacon,* 759 F.2d 989, 996 (2d Cir.1985) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). Plaintiff has met this burden.

■ *b. Defendant's Legitimate Non-discriminatory Business Reason.* Since plaintiff has established a prima facie case, the burden now shifts to the defendant to produce evidence that plaintiff was terminated for a "legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. As in plaintiff's prima facie case, defendant's burden is minimal. Indeed, it is merely "one of production, not persuasion; it can involve no credibility assessment." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097.

Defendant has given five reasons for plaintiff's discharge: (1) his poor penmanship; (2) his repeated challenges to Ms. Belkadi's directions; (3) his inability to display a showcase case properly and within a reasonable time; (4) his mistakenly selling a ring for far less than its actual retail price; and (5) his contacting the Fifth Avenue store for a discount authorization when Ms. Belkadi was out of town. According to defendant, "the primary reason for [plaintiff's] discharge was his inability and refusal to accept and follow directions from his supervisor, Ms. Belkadi." Def.'s Mem. at 14. Ms. Belkadi's deposition details plaintiff's alleged insubordination. *See* Belkadi Dep. at 327–29. Defendant has therefore satisfied its burden for the second strand of the *McDonnell Douglas* burden-shifting analysis; defendant has articulated "clear and specific reasons

for [plaintiff's] firing, supported by evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Schnabel v. Abramson*, 232 F.3d 83, 88 (2000).

■ *c. Plaintiff's Ultimate Burden.* Since defendant has articulated a legitimate, nondiscriminatory reason for firing plaintiff, the burden now shifts back to plaintiff to present sufficient evidence whereby a reasonable jury could conclude that defendant unlawfully discriminated against him. *See id.* (quoting *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 200 (2d Cir.1999)). Evidence impugning the credibility of defendant's proffered reasons combined with plaintiff's prima facie case, and no more, may – though not necessarily – support a jury finding of unlawful discrimination. *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097; *see also Schnabel*, 232 F.3d at 90 (*"Reeves* prevents courts from imposing a *per se* rule requiring *in all instances* that [a Title VII] claimant offer more than a prima facie case and evidence of pretext." (original emphasis)). The key inquiry at the summary judgment stage is "whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of [sex and national origin]." *Minton v. Lenox Hill Hosp.*, 160 F.Supp.2d 687, 693–94 (S.D.N.Y.2001) (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir.2000)); *see also Schnabel*, 232 F.3d at 90 (*"Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." (internal quotations omitted)).

The court finds that plaintiff has adduced sufficient evidence to support an ultimate finding of discrimination. First, plaintiff has produced competent evidence which, if believed, would permit a factfinder to conclude that defendant's proffered reasons for plaintiff's termination are not credible:

- Defendant claims that plaintiff had "poor penmanship." Plaintiff has testified that none of his supervisors or coworkers at the Fifth Avenue store had any problems with his handwriting, and one of his coworkers at the Madison Avenue boutique has testified to the same effect.

- Defendant claims that plaintiff constantly challenged Ms. Belkadi's directions, citing the Fifth Avenue store's practices as precedent. Plaintiff and another coworker have testified that Ms. Belkadi invited suggestions from her staff, and plaintiff claims that "naturally" he drew on his experiences from the Fifth Avenue store.

- Defendant claims that plaintiff was unable to properly arrange a display case to Ms. Belkadi's satisfaction within a reasonable amount of time. Plaintiff claims that he was merely following the policies and procedures of defendant's training materials. One of his coworkers has also testified that she was unaware of any problem with plaintiff's ability to timely set up a display case.

- Defendant claims that plaintiff sold a ring for the wrong price. Plaintiff has testified that the ring was mislabeled and that it was the bookkeeper who mislabeled the ring.

- Defendant claims that plaintiff called the manager of the Fifth Avenue store for a discount authorization while Ms. Belkadi was out of town, in contraven-

tion of the instructions Ms. Belkadi had left. Plaintiff claims that he had not been given Ms. Belkadi's cell phone number before her departure and that he was merely following defendant's policies and procedures in contacting a member of management for a discount authorization.

Evidence has been marshaled which supports both parties' assertions. Deciding which story to believe is the unique province of a jury, and a reasonable jury could credit plaintiff's evidence while rejecting defendant's assertions.

Yet, as *Schnabel* makes clear, that is not enough to withstand defendant's motion for summary judgment. The court must also consider whether plaintiff can meet his ultimate burden of demonstrating that defendant intentionally discriminated against him. If plaintiff cannot, then defendant would be entitled to summary judgment. *See Schnabel*, 232 F.3d at 90.

As indicated above, plaintiff has produced evidence which, if believed by a factfinder, would permit a conclusion that defendant maintained a sales policy which catered to customers' discriminatory preferences. It would not be unreasonable therefore to conclude that Mr. Ames was adversely affected by the discriminatory sales policy. Plaintiff has also proffered circumstantial evidence that he was treated differently on the basis of his sex and national origin – plaintiff was the only male Filipino sales associate when he was terminated; he was not given a key to the display cases while female and non-Filipino sales associates were; his request for leave was originally denied while a female and non-Filipina coworker's request was granted; he was singled out for admonition and public humiliation concerning the state of the boutique's single bathroom. Reading all this evidence in the light most favorable to plaintiff, the court concludes that a reasonable jury could find that unlawful dis-

crimination was a determinative factor in plaintiff's termination. Summary judgment for defendant is therefore inappropriate. *See Schnabel*, 232 F.3d at 91.

### B. The 42 U.S.C. § 1981 Claims

In his Complaint, plaintiff also alleges violations of 42 U.S.C. § 1981. As defendant ably points out, section 1981 does not prohibit discrimination on the basis of national origin or sex. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir.1998). Plaintiff, in his Memorandum of Law in Opposition to Defendants' [sic] Motion for Summary Judgment, indicates that "[t]o the extent that the Complaint seeks relief for violations of 42 U.S.C. § 1981, that claim is hereby withdrawn." Pl.'s Mem. at 2 n. 2.

The court will interpret plaintiff's putative withdrawal of the claim as a request for its voluntary dismissal. *See* Fed. R.Civ.P. 41(a)(2). That request will be granted and plaintiff's claims under 42 U.S.C. § 1981 will be dismissed with prejudice.

## V. CONCLUSION

The court realizes that plaintiff's case is far from airtight, and he may have difficulty convincing a jury that he has been a victim of discrimination. Plaintiff does not, however, need to have an airtight case in order to defeat defendant's motion for summary judgment. He need only show that there are disputed issues of material fact. That he has done. For the foregoing reasons, defendant's motion for summary judgment must be and is hereby **DENIED**. Plaintiff's claims under 42 U.S.C. § 1981 are **DISMISSED WITH PREJUDICE**.

The parties shall appear at 10:00 a.m., April 8, 2002, for a pretrial conference at

which time the court will set a final trial schedule.

SO ORDERED.